UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NORTH CAROLINA
WESTERN DIVISION

No. 5:11-CV-747-F

EUGENE N. DUNSTON,                    )
                    Plaintiff,        )
                                      )
    v.                                )
                                      )
SHERIFF DONNIE HARRISON,              )
in his official and individual capacities, )
Wake County Sheriff's Office Detention )          ORDER
Officers MICHAEL J. HAYES, and        )
DUANE D. GREENFIELD, and former       )
officer WACO DOUGLAS, JR., in their   )
individual capacities, and THE OHIO   )
CASUALTY INSURANCE COMPANY,           )
as surety,                            )
                    Defendants.       )
_____ )

This matter is before the court on the Defendants' motion for summary judgment [DE-47]. The motion has been fully briefed and is ripe for ruling. For the reasons that follow, the motion is ALLOWED in part and DENIED in part.

## FACTUAL AND PROCEDURAL BACKGROUND

The Defendants (collectively, "the officers") move for summary judgment on each of Dunston's pending[1] § 1983 claims and related state-law claims: (1) retaliation for engaging in protected speech, 42 U.S.C. § 1983 (count one); (2) excessive punishment of a pretrial detainee, 42 U.S.C. § 1983 (count two); (3) battery (count five); (4) grossly negligent, willful or wanton

_____

[1] Dunston has dismissed with prejudice counts three and four of his amended complaint. Stipulation of Voluntary Dismissal [DE-46]. Dunston's stipulation also indicates that he is not seeking punitive damages against Sheriff Harrison for counts six and seven.

use of force against Sheriff Harrison in his official capacity (count six); (5) gross negligence and negligent supervision against Sheriff Harrison in his official capacity (count seven); and (6) action on bonds, N.C. Gen. Stat § 58-76-1 *et seq.* (count eight). The facts in this case are vigorously disputed. For purposes of ruling on the officers' motion for summary judgment, the court generally views the facts in the light most favorable to Dunston. However, two of these incidents were recorded. If the video evidence "blatantly contradicts" Dunston's version of the recorded incidents, the court must adopt the facts as demonstrated on the video recordings. *See Scott v. Harris*, 550 U.S. 372, 380 (2007). Dunston's claims relate to four separate incidents that occurred while he was a pretrial detainee in the custody of the Wake County Sheriff's Department.

**A. Pod Incident**

The first incident ("pod incident") occurred on September 25, 2010 at the Wake County Detention Center, where Dunston was awaiting trial on a state charge of felony habitual assault. The officers have produced a video of this incident, which occurred in the community area of Dunston's assigned "Pod" when Dunston arrived for his dinner. Officer Waco Douglas was in charge of the meal procedure for Dunston's pod. According to Dunston, he arrived late to the community area to receive his meal tray because he was in his individual cell waiting for dinner and he expected a detention officer to alert him when the meal trays arrived. When Dunston eventually arrived, his meal tray was not immediately available because the officers had mistakenly ordered an incorrect number of trays. According to Dunston, he calmly approached Officer Douglas and asked about his tray. Officer Douglas asked "where the f[uck] were you" and Dunston calmly responded that he had expected an officer to alert him when the meal trays

arrived in accordance with the customary practice.[2]  Dunston Dep. [DE-55-5] at 113-14.

Dunston indicates that he informed Officer Douglas, "sir, you didn't do what they normally do

[make rounds of the individual cells at meal time and inform the inmates that the trays have

arrived]."  *Id.* at 114.  Dunston alleges that Officer Douglas responded, "just shut up," and

instructed Dunston to move away from the desk.  *Id.*  Dunston maintains that he complied with

this order.

Officer Norman James arrived with the tray a short time later, and it is at this point that

the video recording begins.[3]   When the meal tray arrived, Dunston and Officer Douglas engaged

in a heated conversation.[4]  Although the video does not have sound, it reveals that Dunston was

pointing his finger and yelling at Officer Douglas in a combative, aggressive manner.  Dunston

alleges that Officer Douglas stated, "next time, you better have your so and so [in the community

area at meal time]."  *Id.* at 116.  Dunston allegedly replied, "[s]ir, with all due respect, I would

---

[2]  The court notes that Officer Douglas disputes this version of the facts.  Officer Douglas indicates that Dunston failed to follow orders to leave his cell for dinner and that Dunston used a combative, aggressive tone when he asked about his meal tray.  Officer Douglas indicates that Dunston was making comments such as "[m]ake me have a motherfucking seat.  You ain't built like that" during this interaction.  Def.'s Mem. of Law in Supp. of Mot. for Summ. J. [DE-48] at 4.  Because the video apparently does not show the initial interaction when Dunston arrived and asked for the tray, the court adopts Dunston's recitation of the facts leading up to Officer James arrival in the pod (where the video begins).  *See Scott*, 550 U.S. at 380 (explaining court should adopt a plaintiff's version of the facts except where that version is "blatantly contradicted" by the record).

[3]  For purposes of describing the remainder of the pod incident, the court adopts Dunston's version of the facts, except to the extent they are blatantly contradicted by the video.  *Scott*, 550 U.S. at 380.

[4]  Although Dunston's deposition testimony indicates that he calmly asked for the meal tray and that only Officer Douglas used any vulgar, aggressive language, the video directly contradicts Dunston's account.  *Compare* Video Recording [DE-48-1] *with* Dunston Dep. [DE-55-5] at 112-19.  The video reveals that when Dunston arrived and asked Officer Douglas about his tray, Dunston was yelling at Officer Douglas and pointing his finger at Officer Douglas in an aggressive manner.  Unfortunately, the video does not have audio and it is not possible to know exactly what was said during the exchange.

3

have been, but it's your job to feed me. It's your job to do your job properly." *Id.* Officer Douglas allegedly responded, "I'll beat your so and so[,]" stepped away from the desk, and began taking his utility belt off.[5] *Id.*

The video reveals that as Officer Douglas approached Dunston from behind the desk, Dunston picked up his tray and began walking away from Officer Douglas. However, when Dunston observed Officer Douglas take his utility belt off, Dunston kicked off his shoes in an effort to maintain a firm foothold on the floor and assumed a fighting stance. At this stage, Officer Douglas moved quickly toward Dunston and initiated a takedown procedure, whereby Officer Douglas essentially lifted Dunston off his feet and threw him to the floor. Dunston resisted the procedure and a fistfight ensued. During the altercation, Dunston, Officer Douglas, and Officer James exchanged numerous blows. Dunston admits that he assaulted Officer Douglas during portions of the incident but Dunston denies that Officer Douglas ever gave him a direct order to stop resisting or put his hands behind his back. Dunston alleges that he eventually stopped resisting, but that Officer Douglas continued to strike him.

The video recording demonstrates that Dunston resisted Officer Douglas's attempts to restrain him throughout most of the incident. However, the latter part of the incident occurred behind the meal tray cart, hidden from the video camera. In the light most favorable to Dunston, it is possible that Officer Douglas continued to assault him after he was fully restrained during the portion of the altercation that is not visible in the video. Dunston also alleges that after

---

[5] Officer Douglas testified that he ordered Dunston to take his tray and sit down multiple times prior to the takedown procedure and that Dunston disobeyed these direct orders. Dunston denies that Officer Douglas ordered him to sit down, and because there is no sound on the video the court must adopt Dunston's version for purposes of ruling on the instant motion.

4

Officer Douglas was separated from the incident and Dunston was fully restrained, Officer Douglas returned to where Dunston was restrained on the ground and resumed assaulting him, despite direct orders from his supervisors to remain separated. The video recording does not "blatantly contradict" this version of events.

## B. Hall Incident

The second incident occurred in the hallway as the officers escorted Dunston to the inmate processing center ("hall incident"). Because there is no video of this incident, the court adopts Dunston's version of the facts. The court notes that the officers vigorously dispute Dunston's version of this incident. In the light most favorable to Dunston, the officers took Dunston to the floor for an unspecified reason[6] and fully restrained him. After he was fully restrained, Lieutenant Greenfield continued to physically assault Dunston. Eventually, Dunston was escorted to the inmate processing center.

## C. Inmate Processing Center Incident

The third incident occurred when Dunston arrived at inmate processing center, and a video of this incident has been produced. The video reveals that Dunston, who was fully handcuffed throughout this episode, was resisting the officers' efforts to escort him into the attorney interview room in the inmate processing center. Dunston states that he refused to enter the attorney room because he knew the cameras did not record footage inside that room and Dunston was afraid the officers would continue assaulting him if he were placed in a location outside the reach of the cameras. After Dunston refused numerous verbal orders to enter the

---

[6] The officers indicate that Dunston was resisting their efforts to remove him from the Pod, to handcuff him, and that he was disobeying numerous direct orders.

5

attorney room, Lieutenant Greenfield approached Dunston and placed his hand on Dunston's shoulder in an effort to physically guide him into the room. Dunston continued to resist Lieutenant Greenfield's attempts to escort him into the room and a physical altercation commenced. Dunston remained handcuffed during the incident, but he resisted by turning his shoulders back and forth and planting his feet firmly on the floor.

Eventually, Dunston shoved his head towards Lieutenant Greenfield in what appears to be an attempt to "head-butt" Lieutenant Greenfield. Lieutenant Greenfield responded by placing his hands around Dunston's neck, picking him up by his neck and slamming him down onto the floor. Dunston alleges that he was thrown head first onto the floor, though the video does not definitively show whether Dunston's head or back touched the floor first.[7] The video clearly shows that Dunston, at least initially, continued resisting Lieutenant Greenfield and the other officers after he was taken to the floor. However, Dunston was taken to the floor in the corner of the room and it is not possible to view Dunston's behavior throughout the time he was restrained on the floor. Thus, Dunston's allegation that Lieutenant Greenfield continued beating him after he was fully restrained on the floor is not "blatantly contradicted" by the record. *See* Verified Am. Compl. [DE-16] ¶¶ 87-88.[8]

After the incident, officers decided to allow Dunston to remain in the lobby area of the inmate processing center. The officers took Dunston to see the detention center nurse, and then

---

[7] Because the video does not blatantly contradict Dunston's version, the court assumes that Dunston was thrown face first onto the floor for purposes of ruling on this motion.

[8] Because the amended complaint is "verified" (*i.e.* Dunston has signed a sworn verification page indicating most of the events recounted are based on his personal knowledge), the amended complaint is treated as an opposing affidavit for purposes of summary judgment. *Williams v. Griffin*, 952 F.2d 820, 823 (4th Cir. 1991).

escorted him back to the inmate processing center lobby.  When he returned, the handcuffs were removed and the officers allowed Dunston to write a statement about the events.  Dunston spent approximately thirty minutes unrestrained in the inmate processing center lobby while writing the statement.  Dunston suffered injuries to his tongue, knee, left shoulder and face and he was ultimately transported to a local hospital for treatment of facial swelling.  X-rays revealed no facial fractures, though Dunston was prescribed a pain reliever for two weeks.

### D.  Hayes Incident

The final incident ("Hayes incident") occurred on September 3, 2011 in the "dress out" room of the Wake County Public Safety Center, where arrestees are initially processed before transfer to the Wake County Detention Center.  There is no video footage of this incident.  Accordingly, the court relates the facts in the light most favorable to Dunston.

Dunston was arrested on September 3, 2011 for larceny.  Detention officers allowed Dunston to make a phone call to arrange for someone to post his bond.  However, the phone call was allegedly cut short when Officer Hayes moved Dunston and other detainees to a holding cell for further processing.  Dunston was frustrated that Officer Hayes ordered him to stop using the telephone before he could arrange payment of his bond and he began knocking on the holding cell window in an attempt to alert officers that he wanted to make another phone call.  Officer Hayes allegedly threatened to physically assault Dunston and to place him in disciplinary lockdown for knocking on the cell window.  Dunston was not allowed to place his requested second phone call.

Dunston was next taken to the "dress out room" in which officers search the detainees for contraband and the detainees change into prison attire.  According to Dunston, he complied with

Officer Hayes's orders to empty his pockets, remove his clothing, and with the full strip-search routine. Officer Hayes disputes that Dunston complied with the strip-search procedure, and he called Officers Powe and Assay to assist because Dunston was allegedly noncompliant and unruly. Officer Hayes allegedly told Officer Powe that he intended to "kick [Dunston's] ass through the door." Am. Compl. ¶ 172. Instead of kicking Dunston, Hayes handcuffed Dunston for his alleged non-compliance with the strip-search procedure.

What happened next is vigorously disputed, but in the absence of directly contradictory video evidence, the court must adopt Dunston's version of the episode. The officers, for reasons that Dunston does not really explain,[9] physically forced Dunston to a nearby bench, restrained him, and forcibly completed the strip search of the naked Dunston. During this process, Hayes allegedly placed his knee in Dunston's back and slammed Dunston's head into the bench at least two to four times. Dunston sustained an approximately half-inch long, half-inch deep cut to his forehead that required twelve stiches and a cut on his ear that required two stiches.

## ANALYSIS

### A. Standard of Review

Defendants now move for summary judgment on all of the pending claims in the amended complaint. At summary judgment, the court must examine the evidence presented by both parties and determine if there is a need for trial. *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986); *Greater Balt. Ctr. for Pregnancy Concerns, Inc.* v. *Mayor & City Council of Balt.*, 721 F.3d 264, 283 (4th Cir. 2013). The court examines "whether the

---

[9] The officers testified that Dunston was refusing numerous direct orders to comply with the strip search and was threatening to assault Officer Hayes prior to the takedown.

evidence presents a sufficient disagreement to require submission to a jury or whether it is so one-sided that one party must prevail as a matter of law." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 251-53 (1986). Where the moving party shows that the evidence is so one-sided that it should prevail as a matter of law, the burden shifts to the nonmoving party to come forward with affidavits, depositions, answers to interrogatories, or other evidence demonstrating that there is a genuine issue of material fact that requires trial. *Celotex Corp. v. Catrett*, 477 U.S. 317, 324-25 (1986); *Matsushita*, 475 U.S. at 587; *Pension Ben. Guar. Corp. v. Beverly*, 404 F.3d 243, 246-47 (4th Cir. 2005). An issue of fact is genuine if a reasonable jury could find for the nonmoving party. *Liberty Lobby*, 477 U.S. at 248. A fact is material if proof of the fact might affect the outcome of the case under the substantive law. *Id.* The facts should be viewed in the light most favorable to the nonmoving party, and all reasonable inferences should be made in favor of the non-moving party. *Id.* at 255; *Smith v. Va. Commonwealth Univ.*, 84 F.3d 672, 675 (4th Cir. 1996). However, "[w]hen opposing parties tell two different stories, one of which is blatantly contradicted by the record such that no reasonable jury could believe it, a court should not adopt that version of the facts for purposes of ruling on a motion for summary judgment." *Scott*, 550 U.S. at 380.

## B. Judicial Estoppel

Officer Douglas maintains that the doctrine of judicial estoppel bars all of Dunston's excessive force claims related to the pod incident. The officers rely on *Lowery v. Stovall*, 92 F.3d 219 (4th Cir. 1996), in which the Fourth Circuit held that a civil litigant may not adopt a position in his civil case that is inconsistent with a position of fact taken in a related criminal case. *Id.* at 223-224. The officers assert that "[Dunston] has taken a curious position in this

lawsuit as to the [pod incident]: he has raised a litany of statutory and constitutional claims based entirely on an incident for which he pled guilty." Def.'s Mem. of Law in Supp. of Mot. for Summ. J. [DE-48] at 18.

The officers read *Lowery* far too broadly. Judicial estoppel requires, among other things, that "the party sought to be estopped must be seeking to adopt a position that is inconsistent with a stance taken in prior litigation. *And the position sought to be estopped must be one of fact rather than law or legal theory.*" *Id.* at 224 (citing *Tenneco Chems. Inc. v. William T. Burnett & Co., Inc.*, 691 F.2d 658, 664-65 (4th Cir. 1982)) (emphasis added). That is precisely what occurred in *Lowery*, where the civil litigant's account of the facts in the civil case was entirely inconsistent with the facts he pleaded guilty to in his criminal case. *Id.* at 224-25.

Here, in contrast, Dunston is not seeking to adopt a position of fact that is inconsistent with the facts he admitted when he pleaded guilty to assaulting officer Douglas. Dunston admits assaulting Officer Douglas after he was taken to the ground and engaged in a fistfight with him. *See* Pl.'s Resp. in Opp'n to Def.'s Mot. for Summ. J. [DE-55] at 17. His position in this lawsuit is that Officer Douglas used excessive force both during the takedown and after Dunston was fully restrained and had stopped resisting. These positions of fact have nothing to do with the admitted assault that occurred as the parties struggled on the floor. In the absence of inconsistent factual positions, a plaintiff's guilty plea to an assault that occurred during one portion of a lengthy altercation does not immunize an officer from all excessive force claims related to the incident. *See Wells v. Coker*, 707 F.3d 756, 761 & n.2 (7th Cir. 2013) (explaining the party's positions in the two litigations must be "clearly inconsistent" and characterizing *Lowery* as a "highly fact-dependent [analysis]"); *Lowery,* 92 F.3d at 224 ("Because of the harsh results

attendant with precluding a party from asserting a position that would normally be available to the party, judicial estoppel must be applied with caution."). Accordingly, judicial estoppel does not bar Dunston's claims related to the pod incident.

## C. Qualified Immunity (Count Two)

The officers also argue summary judgment is appropriate on the basis of qualified immunity. Qualified immunity provides government officials with immunity from suit for money damages "insofar as their conduct does not violate clearly established statutory or constitutional rights of which a reasonable officer would have known." *Harlow v. Fitzgerald*, 457 U.S. 800, 818 (1982); *Scott*, 550 U.S. at 377. The qualified immunity analysis proceeds in two steps: (1) "whether the facts that a plaintiff has . . . shown . . . make out a violation of a constitutional right[,]" *Pearson v. Callahan*, 555 U.S. 223, 232 (2009); *Saucier v. Katz*, 533 U.S. 194, 201 (2001); *Doe ex rel. Johnson v. S.C. Dep't of Soc. Servs.*, 597 F.3d 163, 169 (4th Cir. 2010); and (2) "whether the right was 'clearly established' in light of the specific context of the case." *Scott*, 550 U.S. at 377; *Jones v. Buchanan*, 325 F.3d 520, 526 (4th Cir. 2003). Both inquiries must be answered affirmatively before the court may deny qualified immunity. *Pearson*, 555 U.S. at 232, 235-36. The plaintiff bears the burden of proof on the first inquiry and the officers bear the burden of proof on the second. *Henry v. Purnell*, 501 F.3d 374, 377-78 (4th Cir. 2007). In this case, the court begins with the constitutional violation inquiry. *Pearson*, 555 U.S. at 235-36 (explaining court may begin with the clearly established prong).

Under the first inquiry, Dunston must show that the facts, viewed in the light most favorable to him, make out a violation of a constitutional right. As a pretrial detainee, Dunston's right to be free from excessive force is grounded in the due process clause of the Fourteenth

Amendment. *See Orem v. Rephann*, 523 F.3d 442, 445-46 (4th cir. 2008), *abrogated on other grounds by Wilkins v. Gaddy*, 559 U.S. 34, 38 (2010). Dunston must show that the officers "'inflicted unnecessary and wanton pain and suffering[,]'" *Taylor v. McDuffie*, 155 F.3d 479, 483 (4th Cir. 1998) (internal quotation marks omitted), *abrogated on other grounds by Wilkins*, 559 U.S. at 38, and that "the officers' actions amounted to punishment and were not merely 'an incident of some other legitimate government purpose.'" *Robles v. Prince George's Cnty., Md.*, 302 F.3d 262, 269 (4th Cir. 2002) (quoting *Bell v. Wolfish*, 441 U.S. 520, 538 (1979)).

The Fourth Circuit requires consideration of the following factors in determining whether an officer inflicted unnecessary pain and suffering on a pretrial detainee: (1) the need for the application of force; (2) the relationship between the need and the amount of force used; and (3) whether the force was applied in a good faith effort to maintain and restore discipline or maliciously and sadistically for the very purpose of causing harm. *Orem*, 523 F.3d at 446 (quoting *Johnson v. Glick*, 481 F.2d 1028, 1033 (2d Cir. 1973)). Severity of injury is no longer required to succeed on a pretrial detainee excessive force claim. *Wilkins*, 559 U.S. at 38.

The second qualified immunity inquiry is whether the right was clearly established at the time of the official's conduct. *Messerschmidt v. Millender*, —U.S.—, 132 S. Ct. 1235, 1245 (2012). In *Hope v. Pelzer*, 536 U.S. 730 (2002), the United States Supreme Court explained that "[f]or a constitutional right to be clearly established, its contours 'must be sufficiently clear that a reasonable official would understand that what he is doing violates that right.'" *Id.* at 739 (quoting *Anderson v. Creighton*, 483 U.S. 635, 640 (1987)). The Fourth Circuit has held that courts must "'define the right in light of the specific context of the case, not as a broad general proposition . . . that is, [whether it was] clear to a reasonable officer that the conduct in which he

allegedly engaged was unlawful in the situation he confronted.'" *Lefemine v. Wideman*, 672 F.3d 292, 298 (4th Cir. 2012) (quoting *McKinney v. Richland Cnty. Sheriff's Dep't*, 431 F.3d 415, 417 (4th Cir. 2005)), *rev'd on other grounds*, 133 S. Ct. 9 (2012). Cases from the United States Supreme Court, the Fourth Circuit, or the highest court of the state in which the incident took place should be consulted in deciding whether a right was clearly established at the time the incident took place. *Id.* at 299-300. However, the "nonexistence of a case holding the defendant's identical conduct to be unlawful does not prevent denial of qualified immunity [because] 'qualified immunity was never intended to relieve government officials from the responsibility of applying familiar legal principles to new situations.'" *Wilson v. Kittoe*, 337 F.3d 392, 403 (4th Cir. 2003) (quoting *Trulock v. Freeh*, 275 F.3d 391, 405 (4th Cir. 2001) (Michael, J. concurring)); *see also Hope*, 536 U.S. at 741 ("[O]fficials can still be on notice that their conduct violates established law even in novel factual circumstances.").

Here, the court concludes that the officers are not entitled to qualified immunity for any of the four incidents described in the amended complaint. The court addresses each of the incidents below.

**1. The Pod Incident**

Before proceeding to the qualified immunity analysis, the court highlights an important factual issue, which, in the court's view, precludes qualified immunity for Officer Douglas. The pod incident involved a videotaped altercation between Dunston and Officer Douglas. As Dunston notes in his brief, the video footage suggests that Officer Douglas initiated the physical altercation after Dunston had started to disengage from the confrontation. In the light most favorable to Dunston, the video reveals that Dunston picked up his tray and began turning away

from Officer Douglas before Officer Doulgas stepped away from his desk station and started taking off his utility belt.  It is only after Officer Doulgas began taking off his utility belt that Dunston kicked off his shoes and assumed a defensive fighting position.[10]

Turning to the first qualified immunity inquiry, the court must determine whether the facts, viewed in the light most favorable to Dunston, make out a violation of Dunston's right to be free from excessive force as a pretrial detainee.  As discussed, the court should consider (1) the need for the application of force; (2) the relationship between the need and the amount of force used; and (3) whether the force was applied in a good faith effort to maintain and restore discipline or maliciously and sadistically for the very purpose of causing harm.  *Orem*, 523 F.3d at 446.  Assuming that Dunston was moving away from Officer Douglas and Officer Douglas initiated the altercation, there was obviously no need for the application of force in this particular circumstance.  To be sure, the video reveals that Dunston was acting obstreperous prior to the incident and he almost assuredly disobeyed orders to sit down.  However, he disengaged before Officer Douglas applied force and his turn away from Officer Douglas obviated the need for any application of force.  *See Sawyer v. Asbury*, —F. App'x—, 2013 WL 4056186, at *10 (4th Cir. 2013) ("A detainee's refusal to comply with an officer's lawful order is not a license to 'take the gloves off'").  Thus, the court finds that there was no need for the application of force under Dunston's version of the facts.  *Orem*, 523 F.3d at 446.  Of course, if there was no need for the application of force, it is not necessary to examine the relationship between the need for the force

---

[10]  The court has reviewed the video multiple times and while Dunston's account may find some support in the video footage, a reasonable juror could also adopt the view that Dunston assumed the fighting stance at the same time that Officer Douglas took off his utility belt. Nevertheless, a reasonable juror could find that Officer Douglas initiated the physical altercation based on the video, and the court accordingly adopts Dunston's version of the episode for purposes of the qualified immunity analysis.

14

and the amount used or whether force was applied in a good faith effort to maintain discipline. *See id.* Because there was no need for the application of force in these circumstances, officer Douglas's takedown was excessive and Dunston has made a sufficient showing that his right to be free from excessive force was violated.

The court also finds that the right of a pretrial detainee to be free from an officer-initiated physical assault when the detainee does not present any safety risk to the officer was clearly established on September 25, 2010 (the date of the incident). *See, e.g.*, *Orem*, 523 F.3d at 446-47 (holding that use of taser on a restrained pretrial detainee violated plaintiff's right to be free from excessive force where detainee did not present a risk to officer safety); *Jones*, 325 F.3d at 529-31 (holding use of force against detainee excessive where detainee was handcuffed and did not present a risk to officer safety);[11] *United States v. Cobb*, 905 F.2d 784, 785 (4th Cir. 1990) (upholding convictions of four police officers prosecuted under criminal analogue to § 1983 where officers continued beating fully restrained pretrial detainee). The court recognizes that *Orem*, *Jones* and *Cobb* are somewhat distinguishable because the pretrial detainees in those cases were restrained, whereas Dunston was not in this case. However, precise factual matches are not required to put an officer on notice that his conduct violates clearly established law. *Hope*, 536 U.S. at 741. Under *Orem*, *Jones* and *Cobb* a reasonable officer should be on notice that the use

---

[11] Although *Jones* was litigated as a Fourth Amendment excessive force claim because the detainee had not been arrested, the Fourth Circuit recently held that the outcome likely would have been the same under the Fourteenth Amendment standard the court must employ in this case. *See Sawyer*, 2013 WL 4056186, at *8 n.13. As the Fourth Circuit explained in *Sawyer*, *Jones* is instructive for purposes of the clearly established prong in pretrial detainee excessive force cases because it is factually similar to many of these cases. Because a number of Dunston's claims are factually similar to *Jones*, the court will use *Jones* for purposes of the qualified immunity analysis.

of force against a pretrial detainee who does not present any danger to detention officers because he has disengaged from the particular confrontation violates clearly established law.

The court recognizes that police officers "are often forced to make split-second judgments—in circumstances that are tense, uncertain, and rapidly evolving," *Waterman v. Batton*, 393 F.3d 471, 476-77 (4th Cir. 2005) (internal quotation marks omitted), and, for this reason, the court is reluctant to deny qualified immunity. Officer Douglas was in a precarious position in this case: he was supervising a detention center pod with one other officer and over thirty inmates, one of whom (Dunston) was quite clearly upset and yelling at Officer Douglas. It was a potentially volatile environment.[12] Nevertheless, the court is constrained to accept Dunston's account that Officer Douglas initiated the physical altercation after Dunston disengaged, which is supported at least somewhat by the video evidence. Accordingly, the court finds that Officer Douglas is not entitled to qualified immunity for the portion of the pod incident up to the time in which Dunston assaulted Officer Douglas.

The court also finds that Officer Douglas is not entitled to qualified immunity for the portion of the pod incident that took place behind the meal tray cart. As explained above, the video recording system did not capture this portion of the incident because it was obscured by the cart. Dunston alleges that when additional officers arrived in the pod, they fully restrained Dunston and separated Officer Douglas from the altercation. However, despite orders from the

---

[12] In addition, as the officers point out, if Dunston was free to go on a verbal tirade against Officer Douglas without any consequences, the remaining prisoners would have taken note of that fact and the officers' ability to maintain discipline in the pod may have been compromised. The court agrees with this position as a general matter. However, it is the form of discipline chosen in the circumstances (here, forcibly taking Dunston to the floor after he had disengaged) that makes out the excessive force claim. Presumably, the officers had other, less drastic methods for punishing Dunston for his outburst.

supervising officers to stay away from Dunston, Officer Douglas returned to the fully restrained Dunston and assaulted him again.

Under Dunston's version of the facts, Officer Douglas is obviously not entitled to qualified immunity for this portion of the pod incident. Dunston alleges he was fully restrained by the other officers and he did not present a safety risk when Officer Douglas assaulted him on the floor. For the reasons more fully explained above, Officer Douglas violated Dunston's constitutional right to be free from an officer-initiated use of force in these circumstances. Under *Orem*, *Jones*, and *Cobb*, that right was clearly established on September 25, 2010. *See, e.g.*, *Orem*, 523 F.3d at 446-47 (holding that use of taser on a restrained pretrial detainee violated plaintiff's right to be free from excessive force where detainee did not present a safety risk); *Jones*, 325 F.3d at 529-31 (holding use of force against detainee excessive where detainee was handcuffed and did not present a risk to officer safety); *Cobb*, 905 F.2d at 785 (holding continued beating of restrained pretrial detainee constituted excessive force).

The court notes that Officer Douglas is likely entitled to qualified immunity for portions of the pod incident. *See Goodman v. Barber*, —F. App'x—, 2013 WL 4532171, at *3 (4th Cir. 2013) (suggesting court should consider partial summary judgment on qualified immunity grounds in some circumstances). For example, the court presumes that Officer Douglas is entitled to qualified immunity for much of the altercation that occurred on the floor while Dunston was unrestrained and actively resisting efforts to subdue him. *See Grayson v. Peed*, 195 F.3d 692, 696-97 (4th Cir. 1999) (concluding officer entitled to qualified immunity where detainee was unrestrained, agitated, and an immediate threat to officers). However, because the parties do not address this issue, the court will deny summary judgment as to the entire incident

and address this issue with the parties at the trial. The parties proposed jury instructions should contain an instruction on partial qualified immunity, in the event this issue needs to be submitted to the jury.

In sum, the court finds that Officer Douglas is not entitled to qualified immunity for most of the pod incident. As noted, Officer Douglas may be entitled to qualified immunity for the portion of the incident in which he struggled with Dunston on the floor. However, because the officers do not raise this issue in their motion for summary judgment, the court will address this issue with the parties at the trial.

### 2. The Hall Incident

As explained above, the hall incident was not videotaped and the court therefore adopts Dunston's version of the incident for purposes of ruling on the motion for summary judgment. Dunston alleges that as the officers escorted him to the inmate processing center following the altercation with Officer Douglas, Lieutenant Greenfield forcibly took Dunston to the floor, handcuffed him, and assaulted him after he was fully restrained. Adopting Dunston's version of this incident, Greenfield violated Dunston's constitutional right to be free from excessive force as a pretrial detainee. Under the *Orem* factors, there is simply no need to use force on a fully restrained, unresistant[13] detainee and thus the force used could not have been a good faith effort

---

[13] The court notes that in *Orem* the detainee was restrained, but she was nevertheless actively resisting the officers while restrained and the Fourth Circuit concluded that some force was necessary under the first *Orem* factor. *Orem*, 523 F.3d at 446-47. However, the court held the use of the taser was excessive under the second and third factors. *Id.* In this case, Dunston does not specifically state that he was not resisting the officers during the hall incident. *See* Dunston Dep. [DE-55-5] at 125-26; Verified Am. Compl. [DE-16] ¶¶ 83-86. However, in accordance with the summary judgment standard, the court draws the reasonable inference from Dunston's deposition testimony and the allegations in the amended complaint that Dunston was not resisting when Lieutenant Greenfield used force in the hallway. The officers have testified that Dunston was actively resisting during the hall incident.

to maintain and restore discipline. *See Orem*, 523 F.3d at 446-47. It was also clearly established on September 25, 2010 (the date of the hall incident) that an officer uses excessive force against a pretrial detainee when he initiates an unprovoked takedown of a detainee who is not a safety risk and assaults the detainee after he was fully restrained. *See, e.g.*, *Orem*, 523 F.3d at 446-47 (holding use of taser on a restrained pretrial detainee was excessive where detainee did not pose a safety risk to officer); *Jones*, 325 F.3d at 529-31 (holding use of force against detainee excessive where detainee was handcuffed and did not present a risk to officer safety). Thus, Lieutenant Greenfield is not entitled to qualified immunity with respect to the hall incident.

### 3. The Inmate Processing Center Incident

The inmate processing center incident also involved Lieutenant Greenfield and a videotape of the incident has been produced. The video reveals that Dunston was resisting the officers' orders to enter the attorney room in the inmate processing center. Lieutenant Greenfield placed his hand on Dunston in an effort to escort him into the attorney room, but Dunston resisted. Eventually, Dunston shoved his head forward towards Lieutenant Greenfield, in what appears to be an attempt to "head-butt" Lieutenant Greenfield. Lieutenant Greenfield responded by placing his hands around Dunston's neck, picking him up by his neck and slamming him down onto the floor. Dunston alleges that he was thrown head first onto the ground, though the video does not definitively show whether Dunston's head or back touched the floor first.

Turning to the first qualified immunity inquiry, the court finds that this takedown procedure, which occurred while Dunston had both hands handcuffed behind him, constituted a violation of Dunston's right to be free from excessive force as a pretrial detainee. Under the *Orem* factors, the court considers (1) the need for the application of force; (2) the relationship

19

between the need and the amount of force used; and (3) whether the force was applied in a good faith effort to maintain and restore discipline or maliciously and sadistically for the very purpose of causing harm. *Orem*, 523 F.3d at 446.

It is clear that Dunston's attempt to head-butt Lieutenant Greenfield provided sufficient cause to use force to restrain Dunston. However, the amount of force applied was significantly more than what was needed under the circumstances. *See id.* (explaining district court should balance the relationship between the need for the force and the amount of forced used). Dunston remained fully handcuffed throughout the incident, and he was surrounded by Lieutenant Greenfield and two other officers. Nevertheless, Lieutenant Greenfield chose to wrap both hands around Dunston's neck, lift him up by his neck and slam him onto the floor without any assistance from the other officers. Surely a safer takedown procedure was available to the officers in these circumstances. Viewing the video in the light most favorable to Dunston, the court cannot say that this use of force was justified by Dunston's attempt to head-butt Greenfield, or that it was applied in a good faith effort to maintain and restore discipline. Accordingly, the court finds that Lieutenant Greenfield's use of force during the takedown procedure violated Dunston's constitutional right to be free from excessive force.

The more complicated issue with respect to the inmate processing center incident is whether the right to be free from excessive force in this particular context was clearly established at the time of the incident.[14] As explained, the clearly established prong of qualified immunity requires the court to "define the right in light of the specific context of the case, not as a broad

---

[14] The parties' cursory treatment of the clearly established prong in their briefs did not provide much assistance to the court on this issue, though the court recognizes there were significant space constraints.

general proposition . . . that is, [whether it was] clear to a reasonable officer that the conduct in which he allegedly engaged was unlawful in the situation he confronted." *Lefemine*, 672 F.3d at 298 (internal quotation marks omitted). The court has not found (and the parties have not provided) a case addressing the appropriate use of force when a handcuffed inmate attempts to physically assault a detention officer.

However, the court finds that it can extrapolate some general principles from the case law on restrained pretrial detainees that the officers could have applied in this case. *See Hope*, 536 U.S. at 741 ("[O]fficials can still be on notice that their conduct violates established law even in novel factual circumstances."). In *Orem*, for example, the Fourth Circuit held that an officer who used a taser on a restrained pretrial detainee used excessive force where the detainee, while actively resisting, did not pose a safety risk to herself or the officers. *Orem*, 523 F.3d at 446-47. Similarly, in *Jones v. Buchanan*, the Fourth Circuit found that law enforcement officers used excessive force when they physically assaulted a handcuffed detainee who did not present a risk to officer safety. 325 F.3d at 529-31.

Here, it is undisputed that both of Dunston's hands were handcuffed when Greenfield took him to the floor. However, in contrast to *Orem* and *Jones*, Dunston attempted to physically assault Greenfield prior to the takedown. Despite this factual difference, the court concludes that Dunston's right to be free from such a takedown procedure was clearly established at the time of this incident. Pursuant to both *Orem* and *Jones*, a reasonable police officer would have been on notice that grabbing a restrained detainee by the neck, picking him off the ground and slamming him into the ground constituted excessive force, even if the detainee attempted to head-butt him prior to the takedown. This is particularly true where, as here, two other detention officers were

available to assist Greenfield but he chose to engage in this maneuver by himself. *See Orem*, 523 F.3d at 448-49 (finding it relevant that the other officers at the scene did not see a need to engage in the use of force in examining the clearly established prong). Thus, the court finds that the facts of the inmate processing center incident, viewed in the light most favorable to Dunston, make out a violation of a constitutional right, and that the right was clearly established at the time of incident. As a result, Lieutenant Greenfield is not entitled to qualified immunity as to the inmate processing center incident.[15]

### 4. The Hayes Incident

As explained, the Hayes incident was not recorded, and the court must adopt Dunston's version of the incident for purposes of ruling on the motion for summary judgment. The Hayes incident also involved the use of force against Dunston after he was fully restrained. After his larceny arrest on September 3, 2011, Dunston was taken to the "dress-out room" in which officers search the detainees for contraband and the detainees change into prison attire. According to Dunston, he complied with Officer Hayes's orders to empty his pockets, remove his clothing, and with the full strip-search routine. Nevertheless, for reasons that Dunston does not really explain,[16] the officers physically forced Dunston to a nearby bench, restrained him, and forcibly completed the strip search of the naked Dunston. Dunston alleges that during the strip

---

[15] As with the incident involving Officer Douglas, Lieutenant Greenfield may be entitled to qualified immunity for the portions of this incident in which Dunston resisted while they were both struggling on the floor. The court will address this issue with the parties as part of the jury instructions or other pretrial procedures.

[16] The implication of Dunston's testimony is that the officers simply attacked Dunston for no apparent reason. The officers testified that Dunston was refusing numerous direct orders to comply with the strip search and was threatening to assault Officer Hayes prior to the takedown.

search Hayes had his knee in Dunston's back while he slammed Dunston's head into the bench at least two to four times.

As explained in more detail above, Officer Hayes is not entitled to qualified immunity in these circumstances. Viewing the evidence in the light most favorable to Dunston, Hayes physically assaulted Dunston for no reason and continued assaulting him after he was fully restrained. Under *Orem* and *Jones*, the use of force against a restrained pretrial detainee who does not pose an imminent safety risk violates the detainee's Fourteenth Amendment due process rights. *See, e.g.*, *Orem*, 523 F.3d at 446-47; *Jones*, 325 F.3d at 529-31. In addition, the state of the law in the Fourth Circuit as of September 3, 2011 was such that a reasonable officer would have known that the continued application of force on a fully restrained, unresistant pretrial detainee violated clearly established law. *See, e.g.*, *Orem*, 523 F.3d at 448-49; *Jones*, 325 F.3d at 529-31. Accordingly, Officer Hayes is not entitled to qualified immunity.[17]

### D. First Amendment Retaliation Claim (Count One)

The officers also move for summary judgment as to count one, which alleges that Officer Douglas's[18] use of force was in retaliation for Dunston's exercise of his constitutional right to free speech. It is well-established that prisoners may pursue First Amendment claims against corrections officers. *Turner v. Safley*, 482 U.S. 78, 84, 86 (1987). However, retaliation claims must be "regarded with skepticism" because prison officials' ability to maintain prison discipline

---

[17] The officers also request summary judgment on the merits of Dunston's excessive force/unwarranted punishment against a pretrial detainee claim on the basis that "[t]he forecast of evidence does not show that [the officers] used excessive force against Plaintiff." Def.'s Mem. of Law in Supp. of Mot. for Summ. J. [DE-48] at 27. The court finds it unnecessary to address this argument, as it has been sufficiently addressed under the first factor of the qualified immunity analysis above.

[18] Dunston concedes that summary judgment is appropriate on this claim as to Officer Hayes.

would be severely undercut if they faced potential federal retaliation lawsuits each time they imposed a particular punishment. *Adams v. Rice*, 40 F.3d 72, 74 (4th Cir. 1994) ("Every act of discipline by prison officials is by definition 'retaliatory' in the sense that it responds directly to prisoner misconduct. The prospect of endless claims of retaliation on the part of inmates would disrupt prison officials in the discharge of their most basic duties. Claims of retaliation must therefore be regarded with skepticism, lest federal courts embroil themselves in every disciplinary act that occurs in . . . penal institutions."); *Moore v. Bennett*, 777 F. Supp. 2d 969, 984-85 (E.D.N.C. 2011), *aff'd sub nom. Moore v. Bennette*, 446 F. App'x 579 (4th Cir. 2011) (same).

"The First Amendment right to free speech includes not only the affirmative right to speak, but also the right to be free from retaliation by a public official for the exercise of that right." *Suarez Corp. Indus. v. McGraw,* 202 F.3d 676, 685 (4th Cir. 2000). A plaintiff seeking to recover for First Amendment retaliation must establish (1) he engaged in protected First Amendment activity, (2) the defendants took some action that adversely affected his First Amendment rights, and (3) there was a causal relationship between his protected activity and the defendants' conduct. *Id.* at 686; *Constantine v. Rectors & Visitors of George Mason Univ.*, 411 F.3d 474, 499-501 (4th Cir. 2005). "The causation requirement is rigorous; it is not enough that the protected expression played a role or was a motivating factor in the retaliation; [the] claimant must show that 'but for' the protected expression the [government official] would not have taken the alleged retaliatory action." *Tobey v. Jones*, 706 F.3d 379, 390-91 (4th Cir. 2013); *Huang v. Bd. of Governors of Univ. of N.C.,* 902 F.2d 1134, 1140 (4th Cir. 1990).

Here, Dunston alleges that his complaints regarding Officer Doulgas's failure to follow the meal procedure were constitutionally protected speech and that Douglas's use of force was in retaliation for his protected speech. However, even assuming Dunston can make a sufficient showing on the first two elements, this claim fails on the causation requirement. The video in this case shows Dunston yelling at Officer Douglas and pointing his finger at him in a threatening manner and Dunston has admitted assaulting Officer Douglas while they both struggled after the takedown. Dunston's nonverbal aggressive behavior,[19] both before and after the takedown, provides a separate, independent reason for officer Douglas's use of force. Dunston's speech cannot be the "but for" cause of the use of force in light of his otherwise aggressive behavior. *See Tobey*, 706 F.3d at 390-91 ("Claimant must show that 'but for' the protected expression the [government official] would not have taken the alleged retaliatory action."). Accordingly, a reasonable jury could not find that but for Dunston's protected expression, Officer Douglas would not have used force. *See Liberty Lobby*, 477 U.S. at 248; *Huang*, 902 F.2d at 1141. The officers' motion for summary judgment as to count one is therefore ALLOWED.

## E. Government/Public Officer Immunity for Sheriff Harrison (Count Six)

Count six is a claim for negligence, gross negligence, and willful or wanton conduct against Sheriff Harrison in his official capacity. *See* Am. Compl. ¶¶ 267-78. However, Dunston has stipulated that he is not seeking punitive damages against Sheriff Harrison as alleged in ¶ 278. Stipulation of Voluntary Dismissal [DE-46] at 1. Accordingly, Dunston now maintains

---

[19] Dunston's account is that he was calmly complaining to Officer Douglas about the meal time procedure. However, the video evidence directly contradicts this account. The video shows Dunston yelling at Officer Doulgas and pointing his finger at him in a threatening manner. The court is not required to adopt Dunston's version of this event in these circumstances. *See Scott*, 550 U.S. at 380.

that the "willful and wanton conduct" portion of the allegations is irrelevant, as it only related to his claim for punitive damages. According to Dunston, he now seeks compensatory damages only against Sheriff Harrison in count six, based on various state law theories of *respondeat superior*.

As best the court can tell, the parties seem to agree that count six, to the extent it is based solely on Sheriff Harrison's *respondeat superior* liability for the officers' alleged negligence, should survive summary judgment. The officers initially argue that Sheriff Harrison is protected by the doctrine of governmental immunity as to these negligence claims. *See Epps v. Duke Univ., Inc.*, 122 N.C. App. 198, 203-04, 468 S.E.2d 846, 850-51 (1996), *disc. review denied*, 344 N.C. 436, 476 S.E.2d 115 (1996). Dunston concedes that governmental immunity typically applies to imputed negligence claims, but argues that Sheriff Harrison has waived governmental immunity up to the amount of two surety bonds the Sheriff holds,[20] which operate as a form of insurance against imputed negligence claims. *See Golden Rule Ins. Co. v. Long*, 113 N.C. App. 187, 193-94, 439 S.E.2d 599, 603 (1993), *disc. review denied*, 335 N.C. 555, 439 S.E.2d 145 (1993) (explaining public officials sued in their official capacities may waive governmental immunity to the extent they carry insurance or other protections against negligence claims). The officers do not seriously contest that count six, to the extent it is based solely on imputed negligence and as limited by the amount of the surety bonds, should survive summary judgment. Accordingly, the motion for summary judgment is DENIED as to count six. However, as Dunston has already conceded, the claim is based solely on the *respondeat superior* liability of

---

[20] The parties potentially disagree as to the amount of the surety bonds, and the court will address this issue with the parties at the trial as needed. Hopefully, the parties can resolve the issue pretrial without court intervention.

Sheriff Harrison as it relates to the negligence of the other officers and it is limited to compensatory damages up to the amount of the surety bonds.[21]

## F. Negligent Supervision (Count Seven)

Dunston also asserts a state-law negligent supervision claim as to Sheriff Harrison in his official capacity. Unlike the *respondeat superior* theory in count six, this claim alleges that Sheriff Harrison[22] was directly negligent in his supervision of the other officers. *See* Am. Cmpl. [DE-16] ¶¶ 279-89. In North Carolina, an employer is liable for negligent supervision where (1) an incompetent employee committed a tortious act resulting in injury to the plaintiff; and (2) prior to the act, the employer knew or had reason to know of the employee's incompetency. *Hogan v. Forsyth Country Club Co.*, 79 N.C. App. 483, 495, 340 S.E.2d 116, 124 (1986).

The court finds that genuine issues of material fact preclude summary judgment on this claim. For example, neither party explains why any of the officers were "incompetent" under North Carolina law. In addition, it is possible the officers committed tortious acts, but that is ultimately a jury question under these facts. The officers state that only Officer Hayes had a documented history of using excessive force against an inmate, which obliquely suggests that

---

[21] The officers also argue that they are entitled to summary judgment as to count eight, which alleges an Action on Bond pursuant to N.C. Gen. Stat. § 58-76-1 *et seq.* The officers sole argument with respect to count eight is that because counts six and seven should be dismissed, Sheriff Harrison is not liable in his official capacity in any way and the action on bond claim is moot. Because the court is allowing counts six and seven to proceed, the motion for summary judgment as to count eight is also DENIED.

[22] Because this claim is brought against Sheriff Harrison in his official capacity, it is actually a claim against Wake County. *See Epps*, 122 N.C. App. at 203-04, 468 S.E.2d at 850-51. For ease of reference, the court refers to this claim as a claim against Sheriff Harrison. As discussed below, the parties do not address whether a negligent supervision claim can be brought against a county governmental entity under North Carolina law. The court's own research has uncovered some authority suggesting that these claims may proceed, subject to North Carolina immunity doctrines. *See Block v. Cnty. of Person*, 141 N.C. App. 273, 282, 549 S.E.2d 415, 422 (2000) (collecting case).

Sheriff Harrison did not know or have reason to know of Officer Douglas or Lieutenant Greenfield's alleged incompetence. But that lone reference cannot satisfy the officers' burden of showing there is no genuine issue of material fact on the issue of Sheriff Harrison's knowledge of Officer Douglas or Lieutenant Greenfield's alleged incompetency. As the moving party, the officers bear the burden of initially showing that there is no genuine issue of material fact on this claim. *See Celotex*, 477 U.S. at 324-25.

Instead of addressing the state law elements of negligent supervision, the officers rely on *Monell v. Dep't of Soc. Servs.*, 436 U.S. 658 (1978) and various Fourth Circuit cases applying *Monell* in their argument that Sheriff Harrison is not liable for negligent supervision. However, *Monell* provides a mechanism for § 1983 liability against municipalities. *Monell*, 436 U.S. at 690-91; *Carter v. Morris*, 164 F.3d 215, 218 (4th Cir. 1999). *Monell* and its progeny do not address state law claims for negligent supervision, even when those claims are asserted against a public official in his official capacity. *See Evans v. Chalmers*, 703 F.3d 636, 654 (4th Cir. 2012) (explaining *Monell* claims and § 1983 direct supervisory liability claims require a predicate constitutional injury). Negligent supervision claims must be addressed under state common law negligence principles and state immunity doctrines. *See id.* at 655-59 (applying North Carolina immunity doctrines to state common law claims against government officials and government entities); *Epps*, 122 N.C. App. at 203-04, 468 S.E.2d at 850-51 (discussing state immunity doctrines that apply to public officials sued in their official capacities). In addition to failing to address the elements of negligent supervision, the officers also do not address the potential state

28

law immunity doctrines that may shield Sheriff Harrison from liability on this claim.[23]

Accordingly, the motion for summary judgment as to count seven is DENIED. The claim will proceed to trial and the parties will need to address the state law immunity defense and the elements of negligent supervision in the jury instructions and in the context of any Rule 50 motions. *See* Fed. R. Civ. P. 50.

**G. Battery Claim (Count Five)**

The officers concede this claim must survive summary judgment if the qualified immunity defense fails. Because the court has already found that a reasonable jury could find that the officers used excessive force, the court agrees that the battery claim should survive summary judgment. The motion for summary judgment as to count five is therefore DENIED.

<strong>CONCLUSION</strong>

The officers' motion for summary judgment [DE-47] is ALLOWED in part and DENIED in part. It is ALLOWED as to count one and that claim is hereby DISMISSED. It is DENIED as to counts two, five, six, seven and eight, and those claims will proceed to trial. The trial in this matter is currently set for the March 10, 2014 term of court in Wilmington, N.C. As the court has previously explained, the trial may not begin until approximately one or two weeks after March 10. The court will provide a more definitive date by order approximately one week before March 10. However, if the parties or counsel have a scheduling conflict with the March 10 term,

---

[23] The court recognizes the local rules "discourage" replies in civil cases. However, a reply addressing these issues would have been useful in this case. Although it may not have been entirely clear from Dunston's amended complaint that he intended count seven to be a state law negligent supervision claim, any ambiguity as to that issue was dispelled in Dunston's response. If the officers had submitted a reply addressing the state law immunity doctrines, this claim may have been either dismissed or significantly narrowed (as count six was) prior to the trial.

the court is open to continuing the case to a later term of court. The court's open 2014 terms include: April 28, June 2, June 30, July 14, August 4, September 2, September 29, November 3, and December 1, though as explained above the trial will not begin until approximately one and possibly two weeks after the dates listed. In the event the officers exercise their right to an immediate appeal of the qualified immunity rulings, the court will stay the case pending appeal.

SO ORDERED.

This the $\overset{\wedge}{13}$ day of January, 2014.

*James C. Fox*

JAMES C. FOX
Senior United States District Judge

30